IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, )
Department of Public Welfare, )
)                    Civil Action No. 05 - 1345
)
Plaintiff, )                    Chief Judge Donetta W. Ambrose
)
v. )
)
UNITED STATES OF AMERICA and )                    Doc. Nos. 5, 7, 15
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
)
Defendants. )

## MEMORANDUM OPINION

*Ambrose, Chief Judge.*

In this case, Plaintiff, Commonwealth of Pennsylvania Department of Public Welfare ("Pennsylvania") is challenging the decision of Defendant, United States Department of Health and Human Services ("HHS"), to initiate an audit of Pennsylvania's use of Federal matching funds for foster care paid to it under Title IV-E of the Social Security Act. Pennsylvania is seeking judicial review of Program Instruction ACYF-CB-PI-02-06 ("Program Instruction") issued by the Administration for Children and Families ("ACF")[1] of HHS with regard to Title IV-E Foster Care Eligibility Reviews. The Program Instruction was issued to clarify the Secretary's position that the eligibility review procedures established by 42 U.S.C. § 672(a) and (b), as well as by the ACF

---

[1] ACF is charged with the administration of the Title IV-E program under 45 C.F.R. Parts 74 and 92. Essentially, ACF advances estimated Federal matching funds to the States on a quarterly basis, and the States reconcile these amounts with actual expenditures in quarterly financial reports. 45 C.F.R. §§ 74.53, 92.41. In addition to the financial reporting requirements in Parts 74 and 92, States are also required to comply with the record retention rules, which mandate that documentation supporting the expenditures be retained for three years, or longer if a financial management review or audit is started within the three-year period. 45 C.F.R. § 74.53, 92.42. Beginning on September 8, 2003, Part 92 replaced Part 74 for the Title IV-E program. 68 Fed. Reg. 52,843 (Sept. 8, 2003).

implementing regulations, 45 C.F.R. Part 1356, and in particular section 1356.71, do "not, and [were] not intended to replace other types of eligibility reviews, audits or monitoring processes that may be conducted by the Federal government." *See* Program Instruction ACYF-CB-PI-02-06 (July 12, 2002) (Ex. A to Pl's Compl.).)

Pennsylvania has filed a three-count complaint against Defendants, the United States of America and the United States Department of Health and Human Services (collectively "HHS"), in which it seeks the following injunctive and declaratory relief: (1) a declaration that Program Instruction ACFY-CB-PI-02-06 be set aside as in excess of statutory authority; (2) a declaration that 42 U.S.C. § 1320a-2a establishes a complete and exclusive scheme for federal review of state Title IV-E programs; (3) an injunction enjoining HHS from continuing the Office of Inspector General ("OIG") audits of Pennsylvania; and (4) a declaration that HHS may not use a Title IV-E audit program against Pennsylvania that is more severe than that used in other states.

Pennsylvania asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (Little Tucker Act), and 1361 (mandamus statute). However, HHS disputes that subject matter jurisdiction exists here and submits three arguments in support thereof. First, HHS argues that Pennsylvania's claims fail to meet the requirements for judicial review under the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* ("APA"). Second, HHS argues that Pennsylvania's claims should be dismissed for lack of ripeness. Finally, HHS submits that Pennsylvania's complaint fails to meet the requirements for jurisdiction under either the Little Tucker Act or Mandamus Act.[2] Pennsylvania disagrees with HHS, arguing that the decision to

---

[2]Pennsylvania has failed to address this argument in its responsive brief and therefore appears to be conceding that the Court's jurisdiction here cannot be premised on either the Little Tucker Act or the Mandamus Act. The Court agrees with HHS that Pennsylvania has failed to assert facts to establish jurisdiction under either the

initiate the audit and the issuance of the Program Instruction constitute final agency action, and

therefore it is entitled to judicial review under the APA, and that its claims are ripe for review or,

at a minimum, it is entitled to discovery as to the ripeness issue. Pennsylvania further responded by

filing a motion for partial summary judgment on Count A of the complaint, asking the Court to find

as a matter of law that the Program Instruction issued by ACF is contrary to 42 U.S.C. § 1320a-2a

and therefore exceeds statutory authority and is invalid.

For the reasons set forth below, the Court finds that it lacks subject matter jurisdiction over

Pennsylvania's claims and will grant HHS's motion to dismiss. Consequently, the Court finds it

lacks jurisdiction to decide Pennsylvania's Motion for Partial Summary Judgment as to Count A

challenging the validity of the Program Instruction, and therefore, will deny Pennsylvania's Motion

for Partial Summary Judgment. In light of the Court's ruling on these dispositive motions, the Court

will grant HHS's Motion to Strike Improperly Served Discovery and Stay Future Discovery Pending

Resolution of the Motion to Dismiss.

## I.    STANDARD OF REVIEW - MOTION TO DISMISS

HHS has moved to dismiss the Complaint in its entirety under Rule 12(b)(1) and, in the

alternative, under Rule 12(b)(6). Under Rule 12(b)(1), the movant makes either a facial or factual

challenge to the court's subject matter jurisdiction. *Patsakis v. Greek Orthodox Archdiocese of*

*America*, 339 F.Supp.2d 689, (W.D.Pa. 2004) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,*

549 F.2d 884, 891 (3d Cir. 1977)). In a facial attack, the court must consider the allegations of the

complaint as true, similar to a motion to dismiss under Rule 12(b)(6). *Mortensen,* 549 F.2d at 891;

---

Little Tucker Act or Mandamus Act. Therefore, these statutes provide no basis for the Court's jurisdiction in this matter.

3

*Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 711 (3d

Cir. 1982). A factual challenge goes, however, to the court's power to hear the case:

> The factual attack . . . differs greatly for here the trial court may
> proceed as it never could under 12(b)(6) or *Fed. R.Civ. P. 56.*
> Because at issue in a factual 12(b)(1) motion is the trial court's
> jurisdiction its very power to hear the case there is substantial
> authority that the trial court is free to weigh the evidence and satisfy
> itself as to the existence of its power to hear the case. In short, no
> presumptive truthfulness attaches to plaintiff's allegations, and the
> existence of disputed material facts will not preclude the trial court
> from evaluating for itself the merits of jurisdictional claims.
> Moreover, the plaintiff will have the burden of proof that jurisdiction
> does in fact exist.

*Id.* (citing 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1350 (1969)) (footnote

omitted); *see also Hedges v. United States,* 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages,*

*Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991); *Mortensen, id.*). Thus, in a Rule 12(b)(1)

factual challenge, the court must ensure that its ruling is based on an adequate record. *Internat'l*

*Ass'n of Machinists & Aerospace Workers,* 673 F.2d at 711-12. If a defendant presents evidence,

in the form of affidavits and/or documentary evidence, challenging the jurisdictional allegations in

the complaint, plaintiff must respond with affidavits or other sworn proof of his own to controvert

the facts asserted by the defendant. *Id.*

    In the case at bar, HHS appears to be making a facial challenge, as evidenced by its brief in

support of the Motion to Dismiss, as well as by the fact that it has not produced any affidavits or

evidence to disprove any of Pennsylvania's factual allegations regarding subject matter jurisdiction.

    In ruling on a motion to dismiss under Rule 12(b)(6), the Court is required to accept as true

all allegations made in the complaint and all reasonable inferences that can be drawn therefrom, and

to view them in the light most favorable to the plaintiff.[3]  *See Blaw Knox Ret. Income Plan v. White Consol. Indus. Inc.*, 998 F.2d 1185, 1188 (3d Cir. 1993); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992).  The issue is not whether the plaintiff will ultimately prevail, but rather whether "plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief." *See Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994)).  Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *See Port Auth. of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir. 1999) (quoting *Alexander v. Whitman,* 114 F.3d 1392, 1397 (3d Cir. 1997)); *see also Conley v. Gibson,* 355 U.S. 41, 45-46  (1957); *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir. 2000).  Thus, under this standard, a complaint will withstand a motion to dismiss if it gives the defendant adequate notice of the essential elements of a cause of action.  *Gaines,* 354 F.Supp. 2d at 576 (citing *Nami v. Fauver,* 82 F.3d 63, 66 (3d Cir. 1996)).

Courts generally consider only the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss. *Pension Benefit Guar. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Factual allegations within documents described or identified in the complaint may also be considered if the plaintiff's claims are based upon those documents.

---

[3]Nonetheless, a court is not required to credit bald assertions or legal conclusions in a complaint when deciding a motion to dismiss. *Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997)).  Consistently, the courts have rejected "'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law' or 'sweeping legal conclusions cast in the form of factual allegations'"[,] in deciding a motion to dismiss pursuant to Rule 12(b)(6).  *Id.* (citing *Morse,* 132 F.3d at 906 n. 8 (citing Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357 (2d ed. 1997)); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996); *Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir. 1993)).

*Id.* (citations omitted). A district court may consider these documents without converting a motion

to dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1426 (3d Cir. 1997).

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

For purposes of the motion to dismiss, the Court assumes the following allegations of fact

contained in the complaint are true.   At all relevant times including the present, Pennsylvania

participated in the foster care and adoption assistance program established under Title IV-E of the

Social Security Act, 42 U.S.C. §§ 670-679b, which is a cooperative Federal-State grant program.

Under this Title IV-E program, States provide certain child welfare services to needy children in

conformity with Federal requirements in exchange for Federal funds.   Consequently, Pennsylvania

has been audited with respect to Federal funds it received under the Title IV-E program.   For the

period covering1983 through 1989, Pennsylvania was audited at least twice by the OIG and at least

once by ACF with regard to the Title IV-E program.   Pennsylvania was not audited for any period

between 1990 and 1995.

In 1994, Congress enacted 42 U.S.C. § 1320a-2a which directed the Secretary of HHS, in

consultation with the State agencies administering the State Title IV-E (and other) programs, to

"promulgate regulations for the review of such programs to determine whether such programs are

in substantial conformity with – (1) State plan requirements under . . . part[] . . . E, (2) implementing

regulations promulgated by the Secretary, and (3) the relevant approved State plans." 42 U.S.C. §

1320a-2a(a)(1) - (3).  Congress further provided that these regulations shall be promulgated no later

than July 1, 1995, with an effective date of April 1, 1996.   Pub.L.103-432, § 203(c)(3).

Notwithstanding this Congressionally mandated deadline, the Secretary of HHS did not issue the

6

final regulations until January 25, 2000, with an effective date of March 27, 2000. *See* 65 Fed. Reg. 4020 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355, 1356 and 1357).   On July 12, 2002, ACF promulgated the Program Instruction at issue here, for the stated purpose of "provid[ing] additional clarification to States concerning periodic title IV-E foster care eligibility reviews and their relationship to other aspects of title IV-E implementation and enforcement." (Ex. A to Pl.'s Compl. (Doc. No. 1-1).)

On November 19, 2003, OIG informed Pennsylvania that it intended to initiate an audit of the State's Title IV-E program for the period 1998 through 2002. (Compl. ¶ 10.)  Pennsylvania contends that ACF specifically requested OIG to conduct this audit and controlled its timing.[4]  (*Id.*) Pennsylvania further avers that this audit is specifically aimed at establishing a dollar amount for refund to the Federal government for prior fiscal periods that would have been reviewed under the review procedures of 42 U.S.C. § 1320a-2a had HHS promulgated its regulations within the July 1, 1995 deadline established by Congress.  (*Id.*)  In addition, Pennsylvania alleges that ACF requested the OIG audit based on the results of a small probe sample of certain reclassified Title IV-E claims examined in 1999, which were determined to have a higher than normal error rate. (Compl. ¶ 11.) Pennsylvania contends that this sample was not representative of its Title IV-E population and subsequently withdrew its claims.  (*Id.*)  Nonetheless, Pennsylvania alleges ACF considered the small probe sample indicative of problems. (*Id.*)  It is further alleged that although ACF believed Pennsylvania's Title IV-E claims had errors since 1999, ACF did not take any action to review

---

[4]Pennsylvania contends that although OIG has its own independent authority to conduct the audit under the Inspector General Act, OIG would not be acting under that authority in conducting the proposed audit of Pennsylvania's Title IV-E program for the period covering 1998 through 2002, but rather, would be acting on behalf and under the authority of ACF.  For the reasons set forth below, the Court need not decide this issue.

Pennsylvania's claims as required by 42 U.S.C. §674(b) and instead shifted that responsibility to OIG. (Compl. ¶ 12.)

In undertaking the audit of the period covering 1998 through 2002, OIG allegedly informed Pennsylvania that it will be reviewing and auditing more than three hundred sample cases in Philadelphia and Allegheny Counties. (Compl. ¶ 14.) OIG has further indicated it will examine such things as the propriety of the State's provider rates and its issuances of foster care licenses which, Pennsylvania contends, is beyond the scope of prior audits. (Compl. ¶ 15.) Pennsylvania expects the audit will last at least two years and during that time, will consume hundreds, if not thousands, of hours of staff time by child welfare officials at the state and local levels, who will be diverted from their work of improving child welfare services to Pennsylvania children. Pennsylvania contends the costs of the audit have approximated $ 200,000.00 to date  and expects the costs to ultimately exceed $ 1 million. (Compl. ¶ 16.) According to Pennsylvania, OIG has refused to reimburse Pennsylvania for the costs of the audit. (*Id.*)

In the fall of 2004, ACF conducted a review of Pennsylvania's Title IV-E program under the regulations promulgated pursuant to 42 U.S.C. § 1320a-2a and found Pennsylvania to be in substantial conformity with the Federal requirements. Despite this finding, OIG is proceeding with the audit of Pennsylvania at ACF's request and direction, for the period covering 1998 through 2002. (Compl. ¶ 13.)

On September 27, 2005, Pennsylvania instituted the present action by filing a three-count complaint against HHS, setting forth the following claims:  Count A – the Program Instruction issued by ACF is contrary to 42 U.S.C.  § 1320a-2a, and therefore, exceeds statutory authority; Count B – the OIG audits are outside the framework of 42 U.S.C. § 1320a-2a and therefore are

8

unlawful, and the shifting of ACF's Title IV-E review responsibility to OIG violates the Inspector

General Act ("IGA"), 5 U.S.C. App. 3, § 9(a)(2); and Count C – the actions of ACF and OIG vis a

vis the Title IV-E audits of Pennsylvania were arbitrary and capricious, and therefore violate federal

law and the Constitution.  In response, HHS filed a motion to dismiss the complaint.  In addition to

the motion to dismiss, there are two other motions currently pending before the Court:  HHS's

Motion to Strike/Stay Discovery and Pennsylvania's Motion for Partial Summary Judgment.  These

motions have been fully briefed and argued and are now ripe for disposition.

## III.    STATUTORY AND REGULATORY FRAMEWORK

An understanding of the relevant statutory and regulatory framework is necessary to resolving

the pending dispositive motions.

Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-679b, authorizes the appropriation

of Federal funds to States, which have submitted State plans approved by the Secretary, to match

certain expenditures by the States for providing "foster care and transitional independent living

programs for children who would otherwise have been eligible for assistance under the State's plan

approved under [the Aid to Families with Dependent Children ("AFDC") program],[5] and adoption

assistance for children with special needs[.]" 42 U.S.C. § 670 (1997); 45 C.F.R. § 1356.60. In 1980,

Congress established the review structure for Title IV-E with the enactment of the Adoption

Assistance and Child Welfare Act, Pub. L. 96-272. This review procedure, denominated as an

"eligibility" review, was promulgated at 45 C.F.R. part 1356, and in particular §§ 1356.20 through

1356.60; 47 Fed. Reg. 30925 (July 15, 1982), as amended. In 2000, the Secretary amended 45

---

[5]The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, repealed the AFDC program constituting Part A of Title IV of the Social Security Act, 42 U.S.C. § 601 *et seq.*  However, Title IV-E continues to refer to certain former AFDC provisions that were in effect on June 1, 1995.

C.F.R. part1356 and added a new section, §1356.71, which contains the new requirements governing Federal reviews of State compliance with the Title IV-E eligibility provisions established by 42 U.S.C. § 672(a) and (b). The eligibility review focuses on the requirements for eligibility for foster care maintenance payments to verify that children in foster care for whom Federal financial participation is being claimed (or can be claimed) are eligible and are being placed with eligible foster care providers. *Notice of Proposed Rulemaking, Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews,* 45 C.F.R. Parts 1355 and 1356, 63 Fed. Reg. 50058, 50061 (Sept. 18, 1998).

Eligibility reviews conducted pursuant to 45 C.F.R. § 1356.71 utilize random sampling methodologies to select a "sample" of cases for review, to determine the number of ineligible cases and the error rate. 45 C.F.R. § 1356.71(c). Eligibility is determined based on the five factors enumerated in § 1356.71(d)(1). In addition, for each case reviewed, the State must make available a licensing file which contains the licensing history for each provider. 45 C.F.R. §1356.71(g). Reviews are conducted once every three years by a team of state and federal reviewers. 45 C.F.R. 1356.71(a)(3) and (b). From a random sampling of 80 cases (plus a 10 percent oversample of 8 cases), ACF determines sample case ineligibility and dollar error rates in a primary review. 45 C.F.R. § 1356.71(c). In the initial primary review, a state is deemed in substantial compliance if the population error rate is less than fifteen percent; for subsequent primary reviews, substantial compliance will be found if the population error rate is less than 10 percent. *Id.* at §1356.71(c). On secondary reviews following a determination of noncompliance, the case ineligibility or dollar error rate may not exceed ten percent. *Id.* A disallowance is assessed for ineligible cases for the period of time cases are ineligible. *Id.* at § 1356.71(j). The State is also liable for interest on the amount

10

of funds disallowed. *Id.* at § 1356.71(j)(3). In addition, States found to be in noncompliance must develop a program improvement plan ("PIP") jointly with the Federal staff of ACF. *Id.* at § 1356.71(i). States may appeal any disallowances[6] taken by ACF to the HHS Departmental Appeals Board ("DAB") in accordance with the regulations at 45 C.F.R. Part 16.[7] *Id.* at § 1356.71(j)(4).

The purpose of the Title IV-E eligibility reviews under 42 U.S.C. § 672(a) and (b), which "is to validate the accuracy of a State's claims to assure that appropriate payments are made on behalf of eligible children, to eligible homes and institutions, at allowable rates", differs in purpose and scope from the outcomes-based review for conformity reviews under 42 U.S.C. § 1320a-2a. 65 Fed. Reg. 4020, 4070 (Jan. 25, 2000). In 1994, Congress added Section 1123 of the Social Security Act, codifed at 42 U.S.C. § 1320a-la (Pub. L. No.103-432),[8] which directs the Secretary, in consultation with the State agencies administering the State programs under Title IV-E, to promulgate regulations for the review of foster care and adoption assistance programs to determine whether such programs are in substantial conformity with the State plan requirements, implementing regulations and approved State plans. Pub. L. No. 103-432, Title II, Section 203(a), 108 Stat. 4398, 4454-55 (Oct.

---

[6]If ACF makes a determination to recover any funds paid to States for cases determined to be ineligible, it must issue a "disallowance" as set forth in 45 C.F.R. § 201.13. The State must be given written notice of the disallowance and advised of its right to request reconsideration by the DAB, whose decision constitutes HHS' final action in grant disputes. 5 U.S.C. § 301; 45 C.F.R. Part 16; 45 C.F.R. §§ 74.62, 92.43.

[7]The regulations at Part 16, Title 45 of the Code of Federal Regulations set forth the procedures and requirements for obtaining an appeal from final written decisions issued regarding certain disputes that arise under HHS programs. 45 C.F.R. § 16.1. The appeal procedures under Part 16 specifically provide for review by the DAB of disallowances under Title IV of the Social Security Act. 45 C.F.R. Part 16, App. A., § B(a)(1). This internal review process is adversarial in nature, § 16.8, is based on a detailed factual and legal record, §§ 16.8, 16.21, may involve a hearing, including examination and cross examination of witnesses, § 16.11, and the DAB is bound by all applicable laws and regulations, § 16.14.

[8]In 1996, Congress renumbered section 1123 of the Social Security Act as section 1123A, codified at 42 U.S.C. § 1320a-2a. *See* Pub. L. No. 104-193, Title V, Section 504, 110 Stat. 2105, 2278 (Aug. 22, 1996).

31, 1994). This review procedure has been denominated as a "conformity" review by Congress,[9] as well as by the Secretary of HHS,[10] and is promulgated at 45 C.F.R. part 1355, in particular, sections 1355.32-.37.

The conformity review contemplated under section 1320a-2a is outcome-based, that is, it focuses on assisting the States to improve services and outcomes for children and families. 68 Fed. Reg. 41590-01 (July 14, 2003); 63 Fed. Reg. 50058, 50065-66 (Sept. 18, 1998). In particular, the regulation establishes criteria related to child and family services outcomes in determining whether a State is in substantial conformity, in the areas of child safety, permanency for children, and child and family well-being. 45 C.F.R. § 1355.34 (b)(1). In addition, the State's ability to meet the national standards for statewide data indicators associated with a particular outcome and to deliver the services delineated in paragraphs (c)(2) through (c)(7) of § 1355.34 are assessed. Following a review in which it is found to be operating in substantial conformity, a State must complete a full review every 5 years. 45 C.F.R. § 1355.32(b)(1)(i). A State program which is found not to be operating in substantial conformity is required to develop and implement a PIP. *Id.* at §§ 1355.32(b)(2)(i), 1355.35(a)(1). Failure to achieve substantial conformity or to successfully complete a PIP will result in a withholding of Federal funds. *Id.* at § 1355.36. The amount of Federal funds subject to withholding is based on pre-determined percentages of the pool of funds consisting of the State's allotment of Title IV-B funds for each year the withholding applies plus ten

---

[9]The title of the section in Pub. Law No. 103-432 adding section 1123 of the Social Security Act is "Sec. 203 CONFORMITY REVIEWS."

[10]*See* 45 C.F.R. §§ 1355.33-.36. In addition, Attorney Beane explicated at oral argument that the state plan conformity reviews under 42 U.S.C. § 1320a-2a are not audits; while, on the other hand, the eligibility reviews under 42 U.S.C. §§ 671-672 and 45 C.F.R. § 1356.71 do give rise to physical audits on occasion. Transcript of Oral Argument on May 8, 2006 ("Tr.") at 4-5.

percent of the State's Federal claims for Title IV-E foster care administrative costs for each year the withholding applies, depending on the nature of the nonconformity. *Id.* at § 1355.36(b)(4) - (8). In addition, the state agency is liable for interest on the amount of funds withheld by HHS. *Id.* at §1355.36(e)(5). A state may, however, appeal the final determination and any subsequent withholding of, or reduction in, funds, to the DAB within sixty (60) days after receiving notice of nonconformity (as described in § 1355.36(e)(1)) or notice of noncompliance by ACF (as described in § 1355.38(a)(3)) in accordance with 45 C.F.R. Part 16. *Id.* at § 1355.39(a). Moreover, a State may obtain judicial review of an adverse decision of the DAB. *Id.* at § 1355.39(b).

ACF released the Program Instruction at issue here on July 12, 2002 to provide additional clarification to States regarding periodic Title IV-E foster care eligibility reviews under Section 472(a) and (b) of the Social Security Act (42 U.S.C. § 672(a) and (b)) and 45 C.F.R. § 1356.71, and their relationship to other aspects of Title IV-E implementation and enforcement. (Ex. A to Pl.'s Compl. at 1.) In this regard, the Program Instruction states that the eligibility review procedure set forth in the regulation, section 1356.71:

> does not, and was not intended to, replace other types of eligibility reviews, audits or monitoring processes that may be conducted by the Federal government. This includes, but is not limited to, monitoring processes conducted by the Office of the Inspector General (OIG), the General Accounting Office (GAO), or those that arise out of ACF Regional Office quarterly review of title IV-E financial claims filed by State agencies. Thus, the regulations at 45 CFR 1356 do not affect the Federal government's traditional authority to conduct audits and take disallowances.

(*Id.* at 1-2.) The Program Instruction goes on to explain that the review structure set forth in Part 1356 is primarily a management tool to ensure State compliance with requirements impacting child welfare, and only secondarily a tool for fiscal responsibility, inasmuch as the regulation provides for

only periodic reviews and for extrapolated disallowances after a determination of noncompliance following a State's implementation of a PIP. (*Id.* at 2.) In addition, the Program Instruction notes that historically, multiple avenues for review of State eligibility decisions have existed, and the regulation in Part 1356 "did not, and does not, purport to disrupt those other avenues of review, such as OIG audits, which are necessary to ensure the financial integrity of the [Title IV-E foster care] program." (*Id.*) Finally, the Program Instruction clarifies that examinations of a State's Title IV-E financial report (Form ACF-IV-E-1), which are authorized under the regulations at 45 C.F.R. § 74.53, are a discrete process and are not subject to the eligibility review procedures outlined in 45 C.F.R. § 1356.71. Thus, the Program Instruction states eligibility issues that arise as a result of an examination of a State's Title IV-E financial reports will continue to be addressed in ACF or OIG audits or other reviews, rather than through the periodic reviews under 45 C.F.R. § 1356.71. (*Id.*)

The role of the Inspector General of HHS is best explained by an examination of the enabling statute, the Inspector General Act of 1978, as amended, 5 U.S.C. App. 3, § 1 *et seq.* ("IGA"). The Offices of Inspector General were created under the IGA as independent bodies for the purpose of conducting and supervising audits and investigations relating to the programs and operations of the federal establishments set forth in § 11(2),[11] as well as to oversee and recommend policies for activities designed to promote economy, efficiency and effectiveness in the administration of, and to prevent and detect fraud and abuse in, programs and operations. 5 U.S.C. App. 3, §§ 2(1)-(2), 4(a)(1) & (3). The inspector generals are appointed by the President with the advice and consent of the Senate. *Id.* at § 3(a). Although the inspector general reports to and is under the general

---

[11]The Department of Health and Human Services is one of the federal establishments enumerated in §11(2). The term "head of the establishment" refers to the Secretary of Health and Human Services. 5 U.S.C. App. 3, §11(1).

supervision of the head of the federal establishment involved (in this case, the Secretary of HHS) or the officer next in rank, the head or officer next in rank may not prevent or prohibit the inspector general from initiating, carrying out or completing any audit or investigation, including the issuing of subpoenas during the course thereof. *Id.* In addition, the IGA vests the inspector general with broad discretion to determine which investigations and reports relating to the administration of the programs and operations are necessary or desirable. *Id.* at § 6(a)(2). The IGA further allows the Secretary of HHS to transfer to the IG such functions, powers or duties of HHS which the Secretary determines are properly related to the functions of the OIG and would further the purposes of the IGA. *Id.* at § 9(a)(2). The Inspector General's power is not without limitation, however, as the IGA does specifically prohibit the Secretary of HHS from transferring "program operating responsibilities" to the Inspector General. *Id.* at § 9(a)(2).[12]

## IV.    ANALYSIS - MOTION TO DISMISS

HHS advances three main arguments in support of dismissing Pennsylvania's action seeking to enjoin the OIG audit. First, HHS submits that the facts alleged have not established any final agency action that would entitle Pennsylvania to judicial review of its claims under the APA. Rather, according to HHS, Pennsylvania has established only a decision to *initiate* an audit, which is not a final agency action. Second, HHS contends that because Pennsylvania has the ability to raise its arguments as to a defense to any enforcement action, judicial review under the APA is inappropriate. Third, HHS contends that the OIG's decision to audit Pennsylvania is a matter committed to agency discretion and therefore, is not subject to judicial review. Finally, HHS

---

[12]The IGA does not define what is meant by "program operating responsibilities."

15

submits that the ripeness doctrine provides an independent basis for dismissal of Pennsylvania's Complaint.

In response, Pennsylvania counters that the Program Instruction is a final agency action since it represents a settled agency position which has legal consequences. Pennsylvania further contends that the Program Instruction is ripe for review because it meets the Third Circuit's relaxed standard of ripeness in declaratory judgment cases,[13] and because the validity of the Program Instruction involves a pure legal question and questions of statutory construction are presumptively suitable to judicial review.[14]  As to dismissal of the audit challenges, Pennsylvania argues that the Third Circuit's decision in *Univ. of Med. & Dentistry of N.J. v. Corrigan,* 347 F.3d 57 (3d Cir. 2003) ("*UMDNJ*"),  regarding ripeness and finality is readily distinguishable. Pennsylvania further argues that even applying the two-part ripeness standard followed in *UMDNJ*, Pennsylvania's claims meet both the hardship and fitness elements. In addition, Pennsylvania submits that although technically it could raise its defenses to the audit before the DAB, its challenge to the propriety of the audit will "wash out" of the case because DAB would refuse to consider this issue. Finally, Pennsylvania responds to HHS's argument that the audit decision is committed to agency discretion by arguing that this exception to judicial review is applied only in rare circumstances, where there is no meaningful standard against which to judge the agency's exercise of discretion. In the present case, Pennsylvania submits that meaningful standards do exist and therefore the action was not committed to HHS's discretion.

---

[13]In *Khodara Envtl., Inc. v. Blakely,* 376 F.3d 187, 196 (3d Cir. 2004), the Court of Appeals held that to establish ripeness in a declaratory judgment case, the plaintiff need only show: "'"(1) adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.'" *Id.* at 196 (quoting *Pic-A-State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir. 1996)) (other citation omitted).

[14]*Shays v. Fed. Election Comm'n,* 414 F.3d 76, 95 (D.C. Cir. 2005).

In further response, Plaintiff filed a motion for partial summary judgment on the issue of the validity of the Program Instruction, arguing essentially that the Program Instruction is inconsistent with 42 U.S.C. § 1320a-2a and should be invalidated as "'in excess of statutory authority' and 'otherwise not in accordance with law.'" (Pl.'s Br. in Supp. of Mot. for Summ. J. at 15 (quoting 5 U.S.C. § 706(A) and (C)) .) In response, HHS argues that the Court lacks jurisdiction to rule on the validity of the Program Instruction because the mere existence of an interpretive ruling, the Program Instruction, does not create standing under the APA; rather, under 5 U.S.C. § 702, Pennsylvania must demonstrate, among other things, that it has been injured by a final agency action. HHS contends that Pennsylvania has not and cannot allege harm from the Program Instruction itself. In addition, HHS submits that even if the Court has jurisdiction to rule on the validity of the Program Instruction, a finding in Pennsylvania's favor would not redress the alleged injury because such a ruling would merely determine whether the Program Instruction is consistent with the Social Security Act, not whether the Inspector General is acting in excess of his authority under the IGA, and therefore runs afoul of the standing requirements in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

For the reasons set forth below, the Court finds HHS's arguments persuasive and will grant HHS's motion to dismiss the complaint without prejudice.

## A.    Judicial Review Requirements of APA and Ripeness Standard

Pennsylvania asserts that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. However, a federal court may only exercise jurisdiction over claims against the United States where the United States has so consented. *United States v. Mitchell,* 463 U.S. 206, 212 (1983) (citations omitted). In the present case, the only statute that may provide the Court with jurisdiction over Pennsylvania's claims against HHS is the Administrative Procedure Act, 5 U.S.C.

17

§§ 701 to 706.   However, in order for this Court to have jurisdiction of Pennsylvania's claims against HHS under the APA, Pennsylvania must show that it meets all of the requirements for judicial review under the APA.

Generally, the APA affords a person who has been legally wronged because of, or adversely affected by, agency action to seek judicial review of said action, provided the following two requirements are met: (1) judicial review of the agency action must be authorized by statute;  and, (2) the agency action for which judicial review is sought must be a final agency action for which there is no other adequate remedy in a court.  5 U.S.C. §§ 702, 704.  In addition, judicial review of agency action under the APA is unavailable where the agency action is committed to agency discretion by law.  5 U.S.C. § 701(a).  When judicial review is appropriately exercised under the APA, the scope of the court's review extends to all relevant questions of law, the interpretation of constitutional and statutory provisions, and a determination of the meaning or applicability of the terms of an agency action.  5 U.S.C. § 706.  In this regard, a reviewing court may hold unlawful and set aside agency action, findings or conclusions which it determines to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional rights or powers; or in excess of statutory jurisdiction, authority or limitations, among other things.[15]  *Id.* at §706(2)(A) - (C).

In the instant matter, HHS challenges the finality of the alleged agency actions: (1) the

---

[15]Although there are other bases upon which a reviewing court may hold an agency action to be unlawful, those bases are not relevant to the instant motion before the Court.  *See* 5 U.S.C. § 706(2)(D) - (F).

decision of ACF/OIG to initiate an audit;[16] and (2) the issuance and enforceability of the Program

Instruction. With regard to finality, the Supreme Court has delineated a two-part test: "First, the

action must mark the 'consummation' of the agency's decisionmaking process . . . it must not be of

a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or

obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v.*

*Spear,* 520 U.S. 154, 177-78 (1997) (citations omitted); *Star Enter. v. U. S. Envtl. Prot. Agency,* 235

F.3d 139, 145 n. 9 (3d Cir. 2001) (citing *Bennett, supra*). The Court of Appeals has considered the

following five factors in assessing finality: "1) whether the decision represents the agency's

definitive position on the question; 2) whether the decision has the status of law with the expectation

of immediate compliance; 3) whether the decision has immediate impact on the day-to-day

operations of the party seeking review; 4) whether the decision involves a pure question of law that

---

[16]Essentially, Pennsylvania objects to the audit OIG seeks to conduct with respect to the period 1998 through 2002 and seeks to enjoin ACF and OIG from proceeding with the audit, on the basis that the OIG audit is aimed at establishing a dollar amount for refund to the Federal government for the fiscal period 1998 through 2002 when the review that should be conducted for this fiscal period is the conformity review established under 42 U.S.C. § 1320a-2a and the regulations thereunder, 45 C.F.R. Part 1355, which would have been in effect had HHS promulgated the regulations within the deadline established by Congress. The Court knows of no authority and Pennsylvania cites none for the proposition that the governing law for a certain period in time is the law that would have been in place had the regulations been promulgated and taken effect earlier, short of a provision in the new law making it apply retroactively. In any event, the fact that the conformity review regulations did not take effect until March 27, 2000 is of no moment here because even if the conformity review regulations had been in effect for the fiscal period 1998 through 2002, neither section 1320a-2a nor 45 C.F.R. Part 1355 precludes other types of reviews or audits of Title IV-E programs.

This applies equally to Pennsylvania's other objection to the OIG audit, that despite HHS's finding in 2004 after conducting a conformity review that Pennsylvania was in substantial conformity with the regulations and State plan, OIG is proceeding to conduct an audit of Pennsylvania at ACF's request for the fiscal period 1998 through 2002. Underlying these two objections is Pennsylvania's belief that Congress, in enacting the conformity review statute (42 U.S.C. § 1320a-2a), intended to establish a single, comprehensive scheme for Federal oversight of all State Title IV-E programs. Although the Court has determined it is precluded from deciding this issue since it lacks jurisdiction, the Court observes nonetheless that there does not appear to be any support for Pennsylvania's argument in either the plain language of the statutes, regulations, or legislative history. Generally, the Court notes that Congress did not repeal 42 U.S.C. §§ 670-679b (Title IV-E eligibility reviews) with the enactment of Section 1320a-2a. That alone suggests that the conformity review under Section 1320a-2a was not intended to replace eligibility reviews under Section 672. In addition, these reviews are entirely different in purpose and scope. *See* discussion *supra* at 11-12.

does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act." *CEC Energy Co., Inc. v. Pub. Serv. Comm'n of Virgin Islands,* 891 F.2d 1107, 1110 (3d Cir. 1989) (citing *Solar Turbines, Inc. v. Seif,* 879 F.2d 1073, 1080 (3d Cir. 1989) (citing *Fed. Trade Comm'n v. Standard Oil Co. of Cal.,* 449 U.S. 232 239-40 (1980) ("*Standard Oil*"))). The Third Circuit's finality assessment comports with the Supreme Court's determination of indicia of finality: "a definitive statement of the agency's position which has a direct and immediate effect on the petitioner's day-to-day operations, which has the status of law, and of which immediate compliance is expected." *Aerosource, Inc. v. Slater,* 142 F.3d 572, 579 (3d Cir. 1998) (citing *Standard Oil,* 449 U.S. at 239). The Supreme Court noted that in its previous decisions involving review of administrative actions, it has interpreted this finality requirement in a "pragmatic" or "flexible" way. *Abbott Lab. v. Gardner,* 387 U.S. 136, 149-50 (1967) (citations omitted).[17]

The resolution of the finality issue in this case is controlled by the Supreme Court's decision in *Standard Oil, supra,* and the Court of Appeals decision in *UMDNJ, supra.* In *Standard Oil,* the FTC issued a complaint against several oil companies alleging that it had reason to believe that the companies were violating federal law prohibiting unfair competition and deceptive trade practices. 449 U.S. at 232. Prior to completion of the administrative proceedings, one of the oil companies

---

[17]In *Abbott Laboratories,* the Supreme Court held that pre-enforcement review of regulations promulgated by the Commissioner of Food and Drugs was required to prevent a hardship to the drug manufacturer plaintiffs. 387 U.S. at 152-53. The regulations at issue in that case took effect immediately and compelled the drug manufacturers to choose between costly compliance (significant changes in everyday business practices) and the risk of severe criminal and civil penalties for failure to comply. *Id.* at 153. Accordingly, the Supreme Court concluded that judicial review was proper in light of the very real dilemma in which the drug manufacturers were placed. *Id.* Unlike the regulation in *Abbott Lab.,* the Program Instruction here does not place Pennsylvania in a very real dilemma in that the Program Instruction does not impose any rules having a direct and immediate, day-to-day effect on its business affairs under the threat of serious criminal or civil sanctions for non-compliance. Indeed, the mere issuance of the Program Instruction has not caused any harm to Pennsylvania.

filed suit in federal court challenging the FTC's actions on the basis that the Commission lacked sufficient evidence before issuing its complaint to determine it had reason to believe that this particular oil company was violating the law. *Id.* at 236. The Supreme Court found that the term "reason to believe" was not a definitive statement of position and the issuance of a complaint averring a "reason to believe" "ha[d] no legal force comparable to that of the regulation at issue in *Abbott Laboratories*, nor any comparable effect upon [the oil company's] daily business." *Id.* at 242. The Supreme Court contrasted the complaint's lack of legal or practical effect upon the oil company, with the effect of judicial review, *i.e.,* interference with the proper functioning of the agency and a burden for the courts. *Id.* at 242. In this regard, the Supreme Court opined that "[j]udicial intervention into agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise. Intervention also leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." *Id.* (internal citations omitted). The Supreme Court also rejected the oil company's alternative argument that it would be irreparably harmed unless the issuance of the complaint was judicially reviewed immediately, holding that even though the burden of defending the proceeding will be substantial, "'the expense and annoyance of litigation is 'part of the social burden of living under government.'"" *Id.* at 244 (quoting *Petroleum Exploration, Inc. v. Pub. Serv. Comm'n,* 304 U.S. 209, 222 (1938)).

In *UMDNJ,* the Court of Appeals applied the holding in *Standard Oil* to a challenge of the inspector general's decision to initiate a Medicare audit. *UMDNJ* involved a challenge to Physicians at Teaching Hospitals (PATH) audits which the inspector general of HHS intended to conduct to determine whether any of the hospitals had engaged in Medicare overbilling. Upon learning of the intended audits, the hospitals initially elected to have the audits performed by an independent auditor

at their own expense. However, the hospitals never went forward with the independent audits and instead filed suit to enjoin the audits. Since the hospitals refused to go forward with the audits, the inspector general issued administrative subpoenas for the relevant records. The hospitals refused to comply with the subpoenas and the inspector general brought an action in federal court to enforce the subpoenas. 347 F.3d at 62-63.

The district court dismissed the hospitals' claims for lack of jurisdiction on two related grounds. First, the district court held that the decision to initiate the PATH audits was not "final" and therefore the court lacked jurisdiction to review the agency's action under the APA. *Id.* at 68. The district court similarly concluded that the case was not sufficiently ripe at that juncture to allow judicial review. *Id.* In affirming the district court's dismissal of the hospitals' suit to enjoin the audits for lack of jurisdiction, the Court of Appeals addressed both the finality and ripeness of the proposed audits, noting that finality is an element in the test for ripeness. *Id.* (citing *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 812 (2003); *Abbott Labs,* 387 U.S. at 149).

As the Court of Appeals explained:

> Determining whether a dispute over agency action is ripe involves a two-part inquiry. We must assess "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Assoc.,* 538 U.S. at [808]; *Abbott Labs.,* 387 U.S. at 149. The fitness question, in turn, requires an assessment of whether the issues presented are "purely legal," whether the agency action is final for purposes of section 10 of the Administrative Procedures Act, and whether "further factual development would 'significantly advance our ability to deal with the legal issues presented.'" *Nat'l Park Hospitality Assoc.,* 538 U.S. at [812] (quoting *Duke Power Co. v. Caroline Envtl. Study Group, Inc.,* 438 U.S. 59[, 82] (1978)); *Abbott Labs.,* 387 U.S. at 149.

347 F.3d at 68 (footnote omitted). Applying this test to the facts before it, the Court of Appeals

found that two of the above three requirements were met, *i.e.,* the issue of whether the inspector

general has the authority to initiate PATH audits was primarily a legal one, and further factual

development did not appear to be necessary to resolve the issues. Nonetheless, the Court of Appeals

concluded the case was "not sufficiently 'fit' for judicial review" because the inspector general's

decision to initiate the PATH audits was not a final one for purposes of ripeness and judicial review.

*Id.* In so holding, the Court of Appeals reasoned that regardless of how decisive the inspector

general's determination was to initiate the PATH audits, it was only a decision to initiate an

investigation, noting that none of the hospitals had been charged with fraud, nor had the agency

commenced any kind of enforcement proceeding. *Id.* The Court of Appeals further noted that none

of the hospitals had been required to change their billing practices or pay a penalty for past practices,

but were only required to cooperate with the audits. *Id.* at 68-69.

The Court of Appeals' decision in *UMDNJ* was also informed by the decision of its sister

court in *Ass'n of Am. Med. Colls. v. United States,* 217 F.3d 770, 781 (9th Cir. 2000) ("*AAMC*"),[18]

which held that "'[a]n investigation, even one conducted with an eye to enforcement, is

---

[18]In *AAMC*, the alleged final action also involved PATH audits. In that case, medical associations and teaching hospitals brought an action to enjoin medicare reimbursement audits of teaching hospitals under the PATH program that the OIG for HHS was conducting. Plaintiffs alleged that the audits were based on unlawful or retroactively applied standards for Medicare billing and that the audits were being used to coerce settlements on threat of suit under the False Claims Act. 217 F.3d at 773. The Court of Appeals for the Ninth Circuit held that the Plaintiffs' case was unripe as the audits did not constitute final agency action (*id.* at 780-81), and the "outcome[] turn[ed] on contingencies which the court [wa]s ill-equipped to predict." *Id.* at 782. The court of appeals also found significant the fact that the challenged actions related to past billing practices rather than requiring a costly change in present conduct. *Id.* at 782. In finding the agency action unfit for judicial review, the court of appeals rejected plaintiffs' argument that an exception under the hardship prong, as recognized by the Supreme Court in *Abbott Labs*, required immediate judicial review under the facts of that case. The court of appeals found that since none of the PATH audits were complete, it had no evidence that the government had threatened litigation to obtain settlements, and plaintiffs were not faced with a Hobson's choice, the rule in *Abbott Labs* was not implicated because it only applied to regulations that posed an immediate dilemma. *Id.* at 783-84. The court of appeals affirmed the district court's dismissal of the case for lack of jurisdiction, but reversed the district court's dismissal insofar as the dismissal was *with prejudice,* and ordered the case be dismissed without prejudice.

quintessentially non-final as a form of agency action.'" *UMDNJ*, 347 F.3d at 69 (quoting *AAMC*, 217

F.3d at 781). The Court of Appeals in *UMDNJ* thus found that the path of an investigation is highly

uncertain and a very real possibility exists that no enforcement action will ultimately be taken, for

any number of reasons, including the inspector general changing her mind on one or more issues

during the audit. *Id.* Accordingly, the Court of Appeals concluded that "'[j]udicial intervention into

the agency process denies the agency an opportunity to correct is own mistakes and to apply its

expertise.'" *Id.* (quoting *Standard Oil*, 449 U.S. at 242).[19]

In affirming the district court's dismissal of the hospitals' claims, the Court of Appeals also

noted the five indicia of finality that it delineated in *GEC Energy*, and concluded with regard to

whether the decision represents the agency's definitive position on the questions, that intermediate

decisions made in the course of determining what position the agency will ultimately take are not

determinative. *Id.* at 70. As to whether the decision to initiate the audits has the status of law with

the expectation of immediate compliance, and whether the decision has immediate impact on the

day-to-day operations of the hospitals, the hospitals argued that the burdens of complying with the

audits themselves constituted the relevant effects, *i.e.,* audits are a disruptive process that would

detract the hospitals from providing healthcare and would cost over one million dollars. *Id.* Relying

again on *Standard Oil*, the Court of Appeals rejected the hospitals' argument, concluding "[t]hese

burdens . . . are not the kind of burdens that support a finding of finality." *Id.* (citing *Standard Oil*,

449 U.S. at 242). The Court of Appeals found the expense and annoyance of administrative audits

---

[19]The Court of Appeals in *UMDNJ* also rejected the hospitals' further contention that the decision of the agency to employ a certain standard with regard to the questionable billing practices was itself a final action subject to judicial review, for the same reasons stated earlier.

and investigations, like the expense and annoyance of litigation, is "part of the social burden of living under government." *Id.* (quoting *Standard Oil,* 449 U.S. at 244; and citing *CEG Energy,* 871 F.2d at 1110). Even more compelling in *UMDNJ* was the fact that the audits at issue were directed to past conduct and thus the only effects the hospitals would encounter would be related to their participation in the audits/investigation, and any actions that might be taken as a result; there would be no direct effect on the hospitals' "'primary conduct.'" *Id.* (citing *Nat'l Park Hospitality Ass'n,* 538 U.S. at 810; *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 164 (1967)).

Finally, turning to the hardship prong of the ripeness test, the Court of Appeals concluded the hospitals failed to show sufficient hardship that would give rise to a finding of ripeness for judicial review. *Id.* at 71. In reaching this conclusion, the Court of Appeals found the only significant hardships to the hospitals resulting from the decision to initiate the PATH audits were "those related to compliance with a request for information reasonably directed at a legitimate purpose of the inspector general." *Id.* The Court of Appeals thus concluded that "[t]his is a cost that [the hospitals]–recipients of Medicare funding–must face as a 'burden of living under government.'" *Id.* (quoting *Standard Oil,* 449 U.S. at 244).

Moreover, the Court of Appeals affirmed the district court's dismissal of the hospitals' claims for lack of jurisdiction, even though the hospitals raised "profoundly serious questions" regarding the wisdom and fairness of the PATH audits. *Id.* In the end, however, the Court of Appeals found the audits were within the broad authority of the inspector general, and any challenges to this authority must wait until an enforcement or other final action, if any, has been taken against the hospitals. *Id.*

25

1.      **The Audit (Counts B and C)**

   *a.     No Final Agency Action*

It is clear from controlling precedent that decisions to conduct an audit do not constitute final agency action for purposes of judicial review under both the APA and the ripeness doctrine. The Court does not see any reason for finding otherwise in the case at bar. In both *UMDNJ* and this case, the agency action at issue is the decision of the inspector general to initiate an audit. As in *UMDNJ,* the issue of whether the inspector general has the authority to initiate the audit of Pennsylvania's Title IV-E program is primarily a legal one, and that issue does not appear to require further factual development. However, as in *UMDNJ,* the decision to initiate the audit in the present action is not "sufficiently 'fit' for judicial review" because the decision of the inspector general was only a decision to initiate an investigation, and Pennsylvania has not yet been charged with fraud or abuse, nor has any type of enforcement proceeding commenced.

Moreover, the inspector general's decision in this case to initiate the audit of Pennsylvania's Title IV-E claims has no legal force or effect on Pennsylvania's day-to-day business, comparable to that of the regulation at issue in *Abbott Labs. See* Note 17, *supra.* Like the PATH audits in *UMDNJ,* the proposed audit by the inspector general here is directed at past conduct and therefore the only effects on Pennsylvania would be related to its participation in the audits/investigation and any actions resulting therefrom; there would be no direct effect on Pennsylvania's "primary conduct." In this regard, Pennsylvania has not alleged that it had to change its claims procedure for reimbursement of Title IV-E claims, or had to pay a penalty for past practices. So far, all Pennsylvania has been required to do is comply with the audits, just as the hospitals were required to do in *UMDNJ.* Moreover, it is entirely possible that the inspector general will recommend that

no enforcement action be taken against Pennsylvania, and that ACF will not take any such action. Therefore, considering that the audits are just in the initial stages, judicial intervention at this time would deny HHS the opportunity to correct its own mistakes, if any, and apply its expertise, and further, would lead to piecemeal review, resulting in an inefficient and perhaps unnecessary use of judicial and economic resources.

Pennsylvania tries to side-step the finality issue by arguing ACF improperly shifted program operating responsibilities to the inspector general. The hospitals in *UMDNJ* raised the very same issue, albeit in the context of a challenge to HHS's action to enforce the administrative subpoenas, without success. In determining whether the inspector general's subpoenas were lawful and therefore enforceable, the Court of Appeals focused its inquiry on determining whether the subpoenas were issued pursuant to a legitimate purpose. The hospitals had argued that such legitimate purpose was lacking because the inspector general lacked the authority to conduct PATH audits in the absence of fraud or abuse (and admittedly there was no evidence yet of Medicare fraud at the hospitals). 347 F.3d at 64. In particular, the hospitals argued that PATH audits are routine compliance audits and as such, they constitute program operating responsibilities which HHS may not transfer to the inspector general unless it is doing so based on a specific allegation of fraud or abuse. *Id.* at 65. After examining the purpose of the IGA and grant of powers thereunder, the Court of Appeals found that 5 U.S.C. App.3, § 9(a)(2) does not prohibit duplication of functions or copying of techniques and therefore does not provide any basis for concluding that the inspector general's authority cannot overlap with that of HHS, or that a transfer of program operating responsibilities occurs when the inspector general mimics or adopts agency investigatory methods or functions in the course of an independent audit. 347 F.3d at 66 (citing *Winters Ranch P'ship v. Viadero,* 123

27

F.3d 327, 334 (5th Cir. 1997)). The Court of Appeals went on to explain that if HHS "fail[ed] to perform a function that is within its responsibilities, and the inspector general takes on those responsibilities, then it may be correct to speak of 'transfer' of program operating responsibilities." *Id.* (citations omitted). The Court of Appeals further held that just because HHS can and does perform routine compliance audits, that does not necessarily make them program operating responsibilities, as compliance audits are directed at enforcing rules under which the Medicare providers operate and therefore, need not be viewed as part of the "operation" of the Medicare program. The Court of Appeals summarized:

> In any event, the [IGA] contemplates the transfer of any duties that may assist the inspector general in its mission, so long as they are not "program operating responsibilities." Presumably, this would include a range of responsibilities [HHS] might perform, that do not constitute program operating responsibilities. Thus, the fact that [HHS] can and does perform some of these tasks would not alone prevent their transfer to the Office of Inspector General.
>
> . . .
>
> The important issue here is not whether the inspector general is doing something that HHS itself (or its agents) might also do, but whether the PATH audits are within the authority granted the inspector general by the Inspector General Act. For the reasons discussed, we hold that they are.

*Id.* at 67.

Based on *UMDNJ*, the Court finds the fact that ACF may have asked OIG to conduct the audits does not, in and of itself, establish an improper transfer of program operating responsibilities.[20] While the Court must accept as true, for purposes of the motion to dismiss,

---

[20] According to HHS, although both the Title IV-E reviews under 45 C.F.R. Part 1356 and OIG audits examine eligibility, OIG audits typically examine eligibility and other issues to determine whether costs were properly claimed by States and are conducted in accordance with government auditing standards issued by GAO (known as GAO Yellow Book). *See* 5 U.S.C. App. 3, § 4(b)(1)(A).

Pennsylvania's factual allegation that ACF requested OIG to conduct the audit, it does not, however, have to accept as true Pennsylvania's conclusory statement that ACF improperly shifted its Title IV-E responsibilities to OIG in violation of the IGA. Based on the factual allegations in the complaint, the Court cannot say that the eligibility audits that ACF has requested OIG to perform here are outside the authority granted to the inspector general under the IGA. As in *UMDNJ*, if the Title IV-E program audits that ACF wants the inspector general to perform constitute routine compliance or eligibility audits, these audits could arguably be for the purpose of recouping reimbursements improperly claimed and thus, would be more akin to enforcement or management functions, rather than program operating responsibilities. Indeed, historically OIG has conducted audits of Title IV-E programs.[21] In any event, whether ACF's request actually constitutes an unlawful shift of program operating responsibilities to the inspector general will not be known until the audits are complete and the administrative record is fully developed. Therefore, the issue of whether ACF improperly shifted its program operating responsibilities to the inspector general is not a purely legal question and cannot be answered definitively at this juncture. Although none of the factual allegations in the complaint currently supports the conclusion that the audit the inspector general seeks to conduct involves an improper shifting of program operating responsibilities, because the audit is still ongoing and the nature and scope of the audit has yet to be determined, the question of the improper shifting

---

[21] In paragraph 15 of the Complaint, Plaintiff suggests that OIG has conducted audits of Title IV-E programs in the past ("The auditors are going well beyond the normal audit program *used in past OIG Title IV-E audits . . ..*") (emphasis added). In addition, ACF's explanation provided in the Final Rule for 45 C.F.R. § 1356.71(h) in response to comments made regarding the frequency of the eligibility reviews underscores that ACF's Title IV-E review was not intended as the sole mechanism for verifying the propriety and accuracy of the States' claims for Federal matching funds. In response to comments that the Title IV-E eligibility reviews should be conducted more or less frequently than the proposed 3-year period, ACF explained that it did not believe any change was necessary to the 3-year interval between primary reviews because, among other things, "the title IV-E review is not the sole mechanism in place to assure the propriety and accuracy of State' (sic) claiming procedures, since the ACF Regional Offices review the quarterly claims submitted by the States." 65 Fed. Reg. 4020, 4072 (Jan. 25, 2000).

of program operating responsibilities can only be made after the audit is concluded and the true nature of the audit is known.[22] Thus, this issue is not "fit" or ripe for review at this time.

Pennsylvania does not dispute that the Court of Appeals' decision in *UMDNJ* represents controlling precedent as to the ripeness and the finality of its challenges to the OIG audits. (Pl.'s Br. at 25.) However, Pennsylvania maintains that *UMDNJ* is readily distinguishable. In particular, Pennsylvania submits that *UMDNJ* is factually distinguishable in the following six respects. First, Pennsylvania submits OIG in this case does not have an audit program that includes Title IV-E claims of the type at issue here. Second, Pennsylvania is alleging not merely procedural irregularities but an abuse of the audit process by singling out one state for adverse treatment. Third, Pennsylvania submits HHS has refused to issue a subpoena in this case, even though one was specifically requested by Pennsylvania.     Fourth, Pennsylvania contends unlike *UMDNJ*, there is no administrative remedy here through which its duty shifting and improper audit claims can be litigated. Fifth, the audits which OIG seeks to conduct here are not in the ordinary course. Finally, Pennsylvania argues it can demonstrate hardship here while the hospitals in *UMDNJ* could not. For the reasons set forth below, the Court finds no merit to Pennsylvania's argument.

With regard to the first alleged distinction, the Court finds that it is irrelevant whether the inspector general of HHS has an audit program that includes Title IV-E claims of the type at issue here. Pennsylvania reads the Court of Appeals' holding in *UMDNJ* and the IGA too narrowly. Historically, OIG has audited Title IV-E programs. This authority is derived from the IGA which

_____

[22]Nonetheless, Pennsylvania argues that some discovery is needed at this time on the issue of whether ACF improperly shifted  program operating responsibilities to the inspector general.  Pennsylvania should not be allowed to conduct discovery on this issue, because the facts that Pennsylvania seeks to discover will not be known until the audits are concluded.  Therefore, discovery will not help Pennsylvania establish  ripeness at this juncture as to Count B.

does not limit the types of audits the inspector general can perform other than the restriction on shifting of program operating responsibilities. As explained below, whether the audit at issue here involves an improper shift of ACF's program operating responsibilities to the inspector general cannot be determined until the audit is completed. Therefore, the Court finds Pennsylvania's first distinction lacks merit.

As to the second alleged distinction, abuse of the audit process, while it is true that the Court of Appeals was not faced with this issue in *UMDNJ*, that does not alter the fact that the principles of finality and ripeness must still be applied to the facts of this case. Applying those principles to the alleged abuse of the audit process claim in Count C results in the same conclusion that was reached above as to the propriety of the audits in question–insufficient information exists at this juncture to determine whether any such abuse is occurring here and thus must await the conclusion of the audit and final agency action. Therefore, the Court finds Pennsylvania's second distinction also lacks merit.

With regard to the third alleged distinction, the fact that the inspector general here has not issued administrative subpoenas for Pennsylvania's documents is of no moment to the issues of whether the inspector general has the authority to conduct the audits in question, or whether the decision to conduct an audit constitutes final agency action. Thus, it is a distinction without a difference.

As to the fourth alleged distinction, no adequate remedy exists for adjudicating Pennsylvania's duty shifting and improper audit claims, if such a remedy did not exist here for these claims, the Court agrees that would be a material distinction. However, from the record in this case, it simply cannot be determined conclusively that an adequate remedy does not exist. As explained

below in subpart *b*, it will not be known until the administrative investigation and audit are complete and Pennsylvania attempts to seek review of the agency's decision before the DAB as to whether an *adequate* remedy exists. Moreover, the uncertainty as to the availability of an adequate remedy before the DAB underscores the lack of ripeness as to Counts B and C and the need to let the administrative agency make this determination in the first instance.

With regard to the fifth alleged distinction, Pennsylvania attempts to argue that the holding in *UMDNJ* applies only to audits conducted "in the ordinary course," and since the audit at issue here is not being conducted "in the ordinary course," judicial review of Counts B and C is not foreclosed at this time. According to Pennsylvania, the audit at issue here is not being conducted "in the ordinary course" because it is directed solely at Pennsylvania and in excess of the authority granted inspector generals under the IGA, and HHS' conduct is expected to continue into the future. However, as explained earlier, it is premature at this juncture to determine whether the proposed audit is not being conducted in the ordinary course. Therefore, judicial review of Counts B and C must wait the conclusion of the audit and final agency action.

The sixth and final way Pennsylvania attempts to distinguish *UMDNJ* from this case is with regard to the hardship prong of the ripeness test. Pennsylvania contends there are three reasons why it can demonstrate hardship, while the hospitals in *UMDNJ* could not. First, Pennsylvania argues it cannot mount its legal challenges at the end of the audits because HHS has structured the appeal process so Pennsylvania's issues will "wash out" of the case,[23] unlike *UMDNJ*, where the Court of Appeals assumed the issues presented by the hospitals would not "wash out" and could be presented to the DAB. According to Pennsylvania, this "wash out" implicates the hardship prong of the

---

[23]Pennsylvania's "wash out" argument is discussed more fully below in subpart *b*.

32

ripeness standard because it runs afoul of the purpose of the ripeness doctrine to not permanently bar the courthouse door. However, as explained more fully below, it cannot be conclusively determined at this juncture that the courthouse door is closed to Pennsylvania. Therefore, the administrative agency and appeal procedures must be given an opportunity in the first instance to address these issues. Should the agency and/or DAB decline to address them, Pennsylvania should then seek judicial review.

The second reason Pennsylvania maintains it can show hardship is that it is allegedly being coerced into submitting to the audits under an actual threat of criminal prosecution. Pennsylvania argues that it has specifically alleged a genuine threat of imminent prosecution and this satisfies the ripeness requirement.[24] A close examination of the complaint in this case fails to reveal any such allegation. The only place where such allegation is made is in Pennsylvania's brief in opposition to HHS's motion to dismiss. Even so, Pennsylvania fails to set forth any allegations or argument to support that such criminal prosecution was threatened and that it is imminent. A conclusory allegation of such imminent threat, without more, is insufficient to show coercion and therefore hardship under the ripeness test. *Jacobus,* 338 F.3d at 1104-05.

Finally, the third reason advanced by Pennsylvania to show hardship is Pennsylvania's contention that it will likely have to reserve approximately $ 200 million in child welfare funds to

---

[24]In support of this argument, Pennsylvania cites *Jacobus v. Alaska,* 338 F.3d 1095 (9th Cir. 2003); *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 149 F.3d 679 (7th Cir. 1998). *Jacobus* involved a motion to dismiss on mootness grounds. The court of appeals in that case set forth a three-part test for determining whether a credible threat of prosecution existed under a federal statute: "1) 'whether the plaintiffs have articulated a 'concrete plan' to violate the law in question'; 2) 'whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings'; and 3) 'the history of past prosecution or enforcement under the challenged statute.'" 338 F.3d at 1105 (citation omitted). Pennsylvania does not indicate whether or how it has met any of these criteria. Similarly, Pennsylvania does not explain how or why *Commodity Futures Trading Comm'n,* which sought a ruling on the justiciability of a First Amendment facial breadth challenge to criminal statutes, applies to the case at bar.

address the contingency that the inspector general will find overpayments and it will be compelled to repay them.[25]  (Pl.'s Br. at 31.)  Pennsylvania further argues that the huge size of the needed financial reserve for this audit goes well beyond the mere "'expense and annoyance of litigation that is part of the social burden of living under government.'" (*Id.* citing *UMDNJ*, 347 F.3d at 69).)  Pennsylvania fails to cite any authority in support of this argument, and none appears to exist.  The Court finds that while $ 200 million is a significant amount, the focus for establishing hardship in the above precedent has been on the cost of litigation, not the amount of reserves for overpayments which  may or may not be assessed at the completion of the audit.  The costs estimated here and in *UMDNJ* are similar.  Moreover, Pennsylvania has failed to show that the $ 200 million reserve is anything more than an estimate of its potential overpayments.  Given that the estimated cost of the audit to Pennsylvania is substantially similar to the amount claimed in *UMDNJ*,  the Court finds that Pennsylvania has failed to demonstrate a hardship on this basis.

For the reasons set forth above, the Court finds that Pennsylvania has failed to materially distinguish *UMDNJ* from the case at bar and, therefore, *UMDNJ* controls the outcome here.

Finally, in Count C of its complaint, Pennsylvania objects to the OIG audit on the basis that the scope of the proposed audit is more extensive than any previous audit and it is the only State to be subjected to such an extensive audit.  Again, for the reasons set forth above, this claim does not meet the finality requirement or the ripeness test, and therefore,  is best left for the administrative agency to adjudicate in the first instance.

---

[25]The Court notes that Pennsylvania's representation that it will likely have to reserve $ 200 million for overpayments that may be assessed as a result of the audit actually implies that a proper basis may exist for the inspector general to conduct the audit at issue here.

### b.   Pennsylvania's Ability to Raise Its Defenses
### Makes Review Inappropriate

Alternatively, HHS argues that even if Pennsylvania had established a final agency action, judicial review is nonetheless foreclosed because administrative action is reviewable under the APA only if there is no adequate remedy in a court and Pennsylvania has an adequate remedy because it may raise all of its defenses to the audit, including the allegation that the inspector general lacks the authority to conduct the audits, in any future administrative action by ACF to recover misspent Title IV-E funds.  In support of this argument, HHS cites 42 U.S.C. § 1316(d); 45 C.F.R. Part 16 & §§ 74.62, 92.43, & 201.14; *Morales v. TWA,* 504 U.S. 374, 381 (1992); *Gen. Motors Corp. v. Volpe,* 457 F.2d 922, 923-24 (3d Cir. 1972); *N.J. Hosp. Ass'n v. United States,* 23 F.Supp. 2d 497, 501 (D.N.J. 1998); and several written decisions of the DAB.

In response, Pennsylvania counters that it will not be able to raise its legal challenges to the propriety of the inspector general's audit because HHS has structured the appeal process so Pennsylvania's issues will "wash out" of the case.  In particular, Pennsylvania contends the "wash out" of the issues flows from the way HHS has structured the appeal process.  According to Pennsylvania, the inspector general's audit never results in an appealable administrative action because the inspector general provides the evidence obtained during the audits to HHS, and using this evidence, HHS determines that an overpayment exists.  Pennsylvania maintains that it can appeal this overpayment determination, but it cannot challenge how or why the evidence was obtained by the inspector general because of the "'fruit of the poisonous tree' doctrine and its associated exclusionary rule do not apply in civil proceedings." (Pl.'s Br. at 29.)  In support of this argument, Pennsylvania cites *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984).  However, that case is completely

inapposite in that the Supreme Court in *Lopez-Mendoza* considered whether to apply the exclusionary rule to civil deportation proceedings. Notwithstanding this distinction, Pennsylvania fails to explain how that case has any relevance here, or how the holding in *Lopez-Mendoza* supports its argument that it will be unable to challenge the propriety of the audit before the DAB.

Moreover, Pennsylvania's "wash out" argument is undermined by the decisions of the DAB. Related to its "wash out" argument is Pennsylvania's disagreement with HHS's argument that it may raise all of its defenses to the audit to the DAB. Pennsylvania maintains the DAB would refuse to consider the issues of whether the inspector general's audit violated the IGA or was conducted improperly. Pennsylvania submits that some discovery is needed to show that the DAB narrowly construes its own jurisdiction and therefore no viable administrative remedy exists. The Court finds no merit to Pennsylvania's argument. Indeed, a review of Part 16 of Title 45, of the Code of Federal Regulations reveals that the DAB has jurisdiction over all disallowances under Title IV-E. 45 C.F.R. § 16.13 and Part 16 App., § B(a)(1). The regulations further provide that the DAB is bound by all applicable laws and regulations. 45 C.F.R. § 16.14. While the DAB has construed this provision to preclude it from considering constitutional challenges to a statutory provision, *see N.Y. State Office of Children & Family Servs.*, DAB Decision No. 1757 (Dec. 21, 2000), the DAB does not appear to be precluded from considering whether ACF's policies and interpretations of statutes and regulations are valid, *see id., and Cal. Dep't of Soc. Servs.*, DAB Decision No. 1959 (Jan. 25, 2005). Also, the DAB has previously considered whether the inspector general's audit findings and methodologies with regard to audits of claims under Title IV-E programs are correct. *See N.Y. State Dep't of Soc. Servs.*, DAB Decision No. 1358 (Sept. 30, 1992). In light of these decisions of the DAB and that Pennsylvania has not advanced a constitutional challenge to a statute here, the Court

cannot find that the DAB would refuse to consider Pennsylvania's challenges to the propriety of the inspector general's audit and, in fact, these decisions suggest that it is likely that the DAB would review Pennsylvania's challenges to the audit.  At the very least, judicial review is not foreclosed and therefore, the Court declines to find Pennsylvania presently lacks an adequate remedy on this basis.

Pennsylvania further suggests that its challenge to the audit is similar to an issue of public policy that is capable of repetition but evades review.  In this regard, Pennsylvania submits that the "short order" doctrine provides yet another basis for judicial review of its challenges to the inspector general's audit.[26]  Pennsylvania contends that because of the "wash out" problem discussed earlier, the initiation of the inspector general's audit constitutes the kind of "short order" that is subject to judicial review.    Pennsylvania's reliance on the "short-order" doctrine is misplaced.  First, as explained previously, Pennsylvania's "wash out" argument is undermined by the written decisions of the DAB, and therefore, this is not a situation where the actions of ACF and OIG evade review without a chance for redress.  Second, and perhaps more importantly, *S. Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 514-15 (1911), involved *final* orders of the ICC which expired before the civil proceeding challenging their enforcement had concluded.  In the instant case, there are no final orders in the first instance.  Accordingly, the "short-order" doctrine is simply inapposite and therefore, does not provide a basis for judicial review.

---

[26]The "short order" doctrine was created by the Supreme Court to ensure that judicial review of administrative decisions would not be "defeated by shortterm orders capable of repetition, yet evading review . . . without a chance of redress." *S. Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515 (1911); *Finberg v. Sullivan,* 634 F.2d 50, 55 (3d Cir. 1980) (To avoid mootness under the "short order" doctrine, "a complaining party must demonstrate a 'reasonable expectation' that he will be subject to a recurrence of the activity he challenges[, and] . . . that the activity is 'by its very nature' short in duration, 'so that it could not, or probably would not, be able to be adjudicated while fully 'live.'") (citations omitted).

In summary, because there appear to be administrative remedies available to Pennsylvania for review of its challenges to the inspector general's audit, the Court concludes it lacks jurisdiction to review Pennsylvania's challenges to Counts B and C at this time.[27]

### c. Whether Decision to Initiate Audit is Committed to Agency's Discretion

Also in the alternative, HHS argues that because the decision to initiate an audit is committed to the inspector general's discretion, it is not reviewable under the APA. In support of this argument, HHS cites 5 U.S.C. § 701(a)(2), which provides that the APA precludes review of an "agency action [that] is committed to agency discretion by law," and this provision has been interpreted by the Supreme Court to mean that review is precluded under the APA when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830 (1985); *Webster v. Doe,* 486 U.S. 592, 599-600 (1988) (quoting same). HHS submits that the IGA grants the inspector general with sweeping discretion to decide "whether and how to undertake and audit," and this discretion is limited only by what the inspector general determines to be "necessary or desirable." *Webster,* 486 U.S. at 599-600. HHS urges the Court to conclude that this statutory language lacks any meaningful standard that could be applied upon judicial review. Plaintiff counters that this exception to judicial

---

[27]The exhaustion doctrine also supports this Court's determination that Pennsylvania's claims are not entitled to judicial review at this time. Generally, exhaustion of administrative remedies is mandated "so that court proceedings do not prematurely interrupt an ongoing administrative process." *Commw. of PA Dep't of Public Welfare v. United States,* Civ.A. No. 99-175, 2001 U.S. Dist. LEXIS 3492, *47 (W.D.Pa. Feb. 7, 2001) (citing *Kleissler v. United States Forest Serv.,* 183 F.3d 196, 201 (3d Cir. 1999)). Consequently, federal courts have followed this rule because it will "(1) avoid 'premature interruption of the administrative process,' (2) allow the agency to 'develop the necessary factual background,' (3) give the agency the 'first chance' to exercise its discretion, (4) properly defer to the agency's expertise, (5) provide the agency with an opportunity 'to discover and correct its own errors,' and (6) deter the 'deliberate flouting of administrative processes.'" *Id.* at *42-43 (quoting *Kleissler,* 183 F.3d at 201 (quoting *McKart v. United States,* 395 U.S. 185, 194-95 (1969)). Thus, the exhaustion doctrine also supports dismissal of Pennsylvania's complaint.

review is applied only in "rare circumstances" where the relevant law is "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Smriko v. Ashcroft,* 387 F.3d 279, 292 (3d Cir. 2004). Plaintiff maintains that since it has alleged a violation of a specific prohibition in the IGA (§ 9(a)(2)) and that the audit is being conducted improperly, meaningful standards do exist under which judicial review of the claims in Counts B and C can occur.

Because the Court has found that the inspector general's audit does not constitute a final agency decision and that an adequate remedy exists for review of the challenged audit thus precluding judicial review at this time, the Court need not reach HHS's alternative argument that the decision to initiate the audit at issue here is committed to the agency's discretion and therefore is not reviewable under the APA.

## 2. The Program Instruction (Count A)

Because the holding in *UMDNJ* clearly applies to the decision to initiate the audit in this case, Pennsylvania attempts to divert the Court's attention from that holding by asserting that the Program Instruction, not the decision to initiate the audit, is the final agency action. In support of this argument, Pennsylvania submits that the Program Instruction is similar to an "action transmittal" which HHS has not disputed constitutes a final agency action, and therefore, the Program Instruction is a final agency action which has legal consequences. Assuming for purposes of argument that Pennsylvania is correct, it has still failed to show that: (1) the Program Instruction has a direct and immediate effect on Pennsylvania's day-to-day business operations, and (2) that the agency action that is allegedly causing harm to Pennsylvania is the issuance of the Program Instruction.

The mere issuance of the Program Instruction only meets one of the five indicia of finality

delineated in *CEG Energy*, that is, the validity of the Program Instruction involves a purely legal question that does not require further development of the facts. This indicia of finality is clearly outweighed by the absence of the other four indicia of finality. In particular, as to the first factor, although the Program Instruction may be characterized as definitive as to its policy regarding eligibility audits of Title IV-E programs under 42 U.S.C. § 672 and 45 C.F.R. part 1356, the Program Instruction alone does not definitively answer the questions as to its validity or enforceability, or whether the inspector general has the authority to conduct audits of Title IV-E programs, or whether the inspector general's decision to choose Pennsylvania for an audit is arbitrary and capricious. The second indicia of finality is just not implicated here as it cannot be said that there was an expectation that States would immediately comply with the Program Instruction–the Program Instruction does not direct States to do anything, but rather, simply states that Section 672 and Part 1356 do not preclude other types of audits of Title IV-E programs. As to the third indicia of finality, Pennsylvania has not and cannot show that the mere issuance of the Program Instruction had any impact, let alone an immediate impact, on its day-to-day business operations. As stated earlier, the Program Instruction does not compel the States to immediately comply with any agency rule or regulation or statute, and therefore, States are not forced to choose between costly compliance (*i.e.*, significant changes in everyday business practices) and the risk of severe criminal and civil penalties for failure to comply. Indeed, the Program Instruction does not even mention the possibility of civil or criminal penalties associated with any audits. Finally, judicial review would not speed enforcement of the Program Instruction because the validity of the Program Instruction depends on an interpretation of the Social Security Act and therefore has no relevance to the inspector general's authority to conduct the audit at issue, which is derived from the IGA, a completely separate statute.

40

Accordingly, four of the five indicia of finality are missing with regard to the Program Instruction. Therefore, the Court finds that the issuance of the Program Instruction does not constitute final agency action.

Knowing that it cannot succeed in showing that the issuance of the Program Instruction constitutes final agency action, Pennsylvania attempts to argue that the Program Instruction is ripe for judicial review because it meets the Third Circuit's relaxed standard of ripeness in declaratory judgment cases.[28] In support of its argument that the relaxed standard of ripeness applies to the instant action, Pennsylvania cites *Khodara Envtl., Inc. v. Blakely,* 376 F.3d 187, 196 (3d Cir. 2004). In that case, plaintiff, a landfill developer, sought a declaratory judgment that a federal statute regulating development of landfills near airports was unconstitutional and did not apply to a landfill which plaintiff sought to construct and operate near a county airport. However, jurisdiction in *Khodara* was predicated on 28 U.S.C. §§ 1331, 1343; significantly, judicial review was not sought under the APA. *Khodara Envtl., Inc. v. Blakely,* 91 F. Supp. 2d 827, 829 (W.D.Pa. 1999). *Khodara* stands in contrast to *UMDNJ* which, like the case at bar, involved a request for injunctive relief prohibiting an audit by the inspector general and applied the finality requirement under the APA and the two-part ripeness standard set forth in *Abbott Labs.* Also contrasted with *UMDNJ* and the instant case, *Khodara* did not involve a dispute over agency action, but rather, involved a pre-enforcement challenge to a federal statute on constitutional grounds. Thus, the Court of Appeals' decision in *Khodara* is factually distinguishable and therefore the Court finds that the relaxed ripeness standard

---

[28]The Court of Appeals applies a refined ripeness test in declaratory judgment cases because typically in those cases, relief is sought before a completed injury has occurred. Thus, the Court of Appeals applied the following relaxed ripeness standard to pre-enforcement review of a statute in a declaratory judgment case: "'(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.'" *Khodara Envtl., Inc. v. Blakely,* 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Pic-A-State Pa. Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir. 1996)).

does not apply to this case.

Even if the Court were to hold the relaxed ripeness standard does apply here, Pennsylvania would not be able to establish that its claim under Count A is ripe for review. Pennsylvania argues that it is obvious that the first two factors of the relaxed ripeness test are met here. As to the third factor, Pennsylvania contends that the satisfaction of the third factor, "utility of the judgment should also be apparent since the extent to which States may be held financially liable for errors in their programs affects how they allocate resources, and whether millions of dollars in financial reserves must be set aside to cover potential losses instead of being used for current child welfare purposes." (Pl.'s Br. at 24.) However, the Court finds Pennsylvania's application of the third factor misses the mark.[29] A ruling on the validity of the Program Instruction will not resolve the issue of the propriety of the proposed audit because a ruling on the validity of the Program Instruction involves construction of the Social Security Act, while the authority of the inspector general to conduct the audit in question is derived from the IGA. Therefore, the Court is not convinced that a useful purpose would be served by exercising jurisdiction over Pennsylvania's claim in Count A. Accordingly, the Court finds that Count A is not ripe for review at this time under either the traditional ripeness standard applied in analyzing APA cases or the relaxed standard applied in declaratory judgment cases.

**B.    Summary**

In summary, the Court finds Pennsylvania has failed to show that the alleged conduct of ACF

---

[29]Also, it does not appear that Pennsylvania has met the first factor of the relaxed ripeness standard–adversity of interest. To satisfy this factor, courts have required a substantial threat of real harm which remains real and immediate throughout the course of the litigation. *See Presbytery of NJ of Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1463 (3d Cir. 1994) (citing *Step-Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 649 (3d Cir. 1990)). As explained above, no such imminent threat of enforcement exists here.

and/or the inspector general constitutes final agency action such that it is entitled to review under the APA. The Court further finds that Pennsylvania has failed to show that its claims are ripe for review. Therefore, the Court finds it lacks jurisdiction over Pennsylvania's complaint and will dismiss the complaint in its entirety without prejudice.

## V.   PENNSYLVANIA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court finds it cannot rule on the validity of the Program Instruction because as stated earlier, it lacks subject matter jurisdiction over that claim. Therefore, the Court will deny Pennsylvania's Motion for Partial Summary Judgment as to Count A.

## VI.   HHS'S MOTION TO STRIKE/STAY DISCOVERY

On December 8, 13, and 16, 2005, Pennsylvania served several discovery requests on HHS prior to a Rule 26(f) conference, case management conference, and entry of a Western District Local Rule 16.1 Initial Scheduling Order. On December 19, 2005, HHS filed a motion to strike the discovery requests and to stay future discovery pending the resolution of its motion to dismiss filed that same date. The Court delayed ruling on the motion to strike/stay discovery as it found that a ruling on this motion required an understanding and resolution of the substantive issues raised in the motion to dismiss and motion for partial summary judgment. Given its finding that the conduct in question does not constitute final agency action and that further factual development is required at the administrative level, the Court concludes that HHS's motion to strike/stay discovery should be granted. Allowing discovery in this case would run afoul of principles of exhaustion, and since Congress has provided an administrative remedy for the challenges raised here, the agency should be given the first chance to exercise its discretion and develop the necessary factual background. *Kleissler,* 183 F.3d at 201 (citing *McKart v. United States,* 185, 194-95 (1969)). Accordingly, the

43

Court will grant Defendants' Motion to Strike/Stay Discovery.

## VII.   CONCLUSION

For the reasons set forth above, the Court will grant Defendants' Motion to Dismiss without prejudice, deny Plaintiff's Motion for Partial Summary Judgment, and grant Defendants' Motion to Strike/Stay Discovery.  An Order consistent with this opinion will follow.

Dated: September 19th, 2006

BY THE COURT:

s/ Donetta W. Ambrose
DONETTA W. AMBROSE
Chief United States District Judge

cc:    Hon. Lisa Pupo Lenihan
       U.S. Magistrate Judge

       All Counsel of Record
       *Via Electronic Mail*

44

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA,<br>Department of Public Welfare,<br><br>      Plaintiff,<br> -vs-<br><br>UNITED STATES OF AMERICA and UNITED<br>STATES DEPARTMENT of HEALTH and HUMAN<br>SERVICES,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br><br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05-1345

AMBROSE, Chief District Judge.

## ORDER OF COURT

AND NOW, this **19th** day of September, 2006, it is Ordered that the referral to Magistrate Judge Lenihan dated September 28, 2005, is vacated.

It is further Ordered that Defendants' Motion to Dismiss (Docket No. 5) is granted; that Plaintiff's Motion for Summary Judgment (Docket No. 15) is denied; that Defendants' Motion to Strike Improperly Served Discovery and Stay Future Discovery Pending Resolution of the Motion to Dismiss (Docket No. 7) is granted and the case is dismissed without prejudice. Judgment is entered in favor of Defendants and against Plaintiff.

BY THE COURT:

_Donetta F. Ambrose_

Donetta W. Ambrose,
Chief U. S. District Judge